UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RIYAN WILLIAMS**,<br><br>    *Plaintiff,*<br><br>v.<br><br>**CONSUMERINFO.COM, INC. and EXPERIAN INFORMATION SOLUTIONS, INC.**,<br><br>    *Defendants.* | Case No. 1:24-cv-02017-RCL |

## MEMORANDUM OPINION

This case concerns Plaintiff Riyan Williams' suit against defendants ConsumerInfo.com, Inc. (CIC) and Experian Information Solutions, Inc. (EIS), regarding Mr. Williams' use of the defendants' credit monitoring service. Before the Court is the defendants' Motion to Compel Arbitration and to stay proceedings pending the outcome of arbitration. Mot. to Compel Arbitration, ECF No. 17. Defendants argue that a valid agreement to arbitrate exists between themselves and Mr. Williams; that EIS may enforce the arbitration agreement directly, or alternatively EIS may enforce it as a third-party beneficiary; and that any dispute over the arbitrability of Mr. Williams's claims, including questions of unconscionability, have been properly delegated to an arbitrator. Mr. Williams, proceeding *pro se*, opposes the motion. He contends first that no valid agreement to arbitrate exists due to lack of mutual assent; second, that if such an agreement exists it is unconscionable; third, that Defendant EIS may not enforce the agreement; and fourth, that the delegation of arbitrability to the arbitrator is invalid. The Court agrees with the defendants, and accordingly will **GRANT** the motion to compel arbitration and stay the proceedings.

1

## I. BACKGROUND

### A. Factual Background

The subject of this dispute is Mr. Williams' experience with the defendants' credit monitoring service. Defendant EIS is an affiliate of Defendant CIC, and Defendant CIC also does business as Experian Consumer Services (ECS). Declaration of Mr. Dan Smith, Director of Product Operations for CIC ("Smith Decl."), ECF No. 17-1, ¶ 1–2. CIC and ECS are both wholly owned subsidiaries of Experian Holdings, Inc. under the parent company Experian plc. *Id.* ¶ 2. CIC/ECS operates a credit monitoring service, providing credit reports to consumers, called CreditWorks. *Id.* ¶ 1.

Plaintiff Riyan Williams, proceeding *pro se*, enrolled in CreditWorks on June 10, 2018. *Id.* ¶ 3. He alleges that Defendants CIC and EIS failed to investigate inaccurate information contained in his credit report furnished by the defendants, and that the defendants subsequently failed to reinvestigate the inaccurate information when he disputed it. Compl. ¶ 83–97, *Williams v. ConsumerInfo.com, Inc.*, No. 2024-CAB-3758 and No. 1:24-cv-2017 (RCL), reproduced in Receipt of Superior Court Transfer Documents, ECF No. 15.[1] He alleges that the inaccurate information damaged his creditworthiness and "hindered [his] ability to provide for [his] family." *Id.* at 1. Specifically, Mr. Williams identifies various violations of the Fair Credit Reporting Act (FCRA), 16 U.S.C. § 1681 *et seq.*, as well as state contract law violations and unjust enrichment. *Id.* ¶ 110–49.

Mr. Williams filed his complaint in June 2024 against "ConsumerInfo.com, Inc., d/b/a Experian, Experian Information Solutions, Inc., d/b/a Experian" in D.C. Superior Court. Compl.

---

[1] Mr. Williams originally filed his complaint in D.C. Superior Court, No. 24-CAB-3758, and it was removed to this Court. Notice of Removal, ECF No. 1. His complaint is reproduced in multiple places, including in a transfer of documents from D.C. Superior Court to this Court. *See* Receipt of Superior Court Transfer Documents, ECF No. 15. Accordingly, this opinion cites to the complaint as reproduced in the transfer of documents.

at 1. The following month, the defendants removed the case to this Court. Notice of Removal at 1–3, ECF No. 1. They filed two answers on July 18, 2024, one on behalf of EIS and another on behalf of CIC. Answer, ECF No. 7 ("EIS Answer"); Answer, ECF No. 8 ("CIC Answer").[2]

The parties met and conferred on July 29, 2024, and the defendants indicated their intent to file a motion to compel arbitration. Meet and Confer Statement, ECF No. 14. On August 21, 2024, the defendants filed said motion. Mot. to Compel Arbitration, ECF No. 17. The defendants contend that when Mr. Williams enrolled in CreditWorks, "he agreed to arbitrate 'all disputes and claims between [him and the defendants]' that arise out of, or relate to, his CreditWorks agreement." *Id.* at 3.

### B. Contractual Background

As part of CreditWorks' enrollment process, Mr. Williams was required to complete two webforms, the first of which required him to enter personal information such as his name, address, and e-mail address. Smith Decl. ¶ 3. After doing so, Mr. Williams had to click a purple button that reads "Submit and Continue" to proceed to the next webform. *Id.*; *see also id.*, Ex. 1 (showing a representation of the first webform). The second webform required Mr. Williams to enter his social security number, date of birth, and a username and password. Smith Decl. ¶ 3. To complete the enrollment process, Mr. Williams was required to click a purple "Submit Secure Order" button. *Id.* ¶ 5. Mr. Williams would not have been able to enroll without completing these steps. *Id.*; *see also id.*, Ex. 2 (showing a representation of the second webform).

Immediately above the "Submit Secure Order" button appears the following disclosure: "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as

---

[2] In both answers, Defendants noted that "[CIC], which operates as [ECS], is a separate legal entity from [ECS]. Because it is not clear which entity Plaintiff intended to sue, answers are being filed on behalf of both [CIC] and [EIS]." *See* Answer at 1 n.1, ECF No. 7; Answer at 1 n.1, ECF No. 8.

3

well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." *Id.* ¶ 3; *id.* Ex. 2. The entire disclosure was in bold font and the phrase "Terms of Use Agreement" was offset in bold, blue text as a hyperlink that, if clicked, would have presented Mr. Williams with the full text of the Terms of Use. *Id.* ¶ 4; *id.* Ex. 2.

Three versions of the Terms of Use Agreement were in effect at various points over the course of Mr. Williams' enrollment in CreditWorks: (1) the version in effect when Mr. Williams first enrolled (hereinafter referred to as the "2018 TOU"); (2) a Terms of Use Agreement that took effect in January 2019 (hereinafter referred to as the "2019 TOU"); and (3) a Terms of Use Agreement dated December 11, 2023, which was in effect when Mr. Williams initiated this lawsuit (hereinafter referred to as the "2023 TOU"). *See* Smith Decl. ¶¶ 3, 5, 9.

The 2018 TOU states in the "Overview and Acceptance of Terms" section that "the terms 'we,' 'us' or 'ECS' refer to [CIC], an Experian company (also known as [ECS]), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers. . . ." Smith Decl. Ex. 3. The 2018 TOU also contains an arbitration agreement that states: "ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites . . . . " *Id.* Finally, the 2018 TOU contains an amendment provision:

> This Agreement may be updated from time to time. You should check this Website regularly for updates to this Agreement. Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement. Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS.

*Id.* Subsection (g) of the arbitration agreement section of the 2018 TOU states that users may reject changes to the arbitration provision and require ECS to use the provision in effect at a

4

user's time of enrollment in the event of a dispute. *Id.* CreditWorks then amended the TOU again in 2019 to enlarge the scope of its arbitration agreement. *Id.*

On December 11, 2023, CreditWorks again amended its Terms of Use. *See* Smith Decl. Ex. 4. This 2023 TOU was the version in effect when Mr. Williams filed his complaint. *Id.* ¶ 5. The 2023 TOU defines "ECS" more expansively than the 2018 TOU, adding, as relevant here, "affiliates (including, but not limited to, [EIS])," in the "Overview and Acceptance of Terms" section. *Id.* Ex. 4. The 2023 TOU also contains an amendments provision like the 2018 TOU. *Id.* The 2023 TOU, like the 2018 TOU and 2019 TOU, contains an arbitration agreement. *Id.* The arbitration agreement in the 2023 TOU defines "ECS" as having the same meaning as in the "Overview and Acceptance of Terms" section and expressly incorporates that definition in the arbitration agreement. *Id.* The 2023 TOU was in effect when Mr. Williams filed suit. The arbitration agreement contained within the 2023 TOU reads as follows in relevant part:

> ECS and you agree to arbitrate all disputes and claims between us that arise out of or relate to this Agreement [the 2023 TOU], which includes any Information you obtain through the Services or Websites, to the maximum extent permitted by law, . . . .
>
> This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us relating to, or arising out of, this Agreement, any Service and/or Website, including any Information you obtained through the Services or Websites, subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to, claims brought by you against ECS, whether based in contract, tort, statute (including, without limitation, the Fair Credit Reporting Act and the Credit Repair Organizations Act), for fraud, misrepresentation or any other legal theory; claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising). . .
>
> All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is

5

unenforceable, void or voidable including, but not limited to, on grounds of unconscionability . . . .

*Id.*

On August 21, 2024, the Defendants filed a Motion to compel arbitration and stay the proceedings. Mot. to Compel, ECF No. 17. Mr. Williams filed his response the following day, Resp. in Opp'n to Mot. to Compel Arbitration and Stay ("Opp'n"), ECF No. 18, and Defendants filed a reply on August 28, 2024. Reply in Supp. of Mot. to Compel Arbitration ("Reply"), ECF No. 19. On September 9, 2024, Defendants filed a Notice of Supplemental Authority, ECF No. 20, and Mr. Williams responded on September 12, 2024. Resp. to Notice of Suppl. Authority, ECF No. 21. The Motion is therefore ripe for this Court's review.

## II.   LEGAL STANDARDS

The Federal Arbitration Act (FAA) "creates a strong presumption in favor of enforcing arbitration agreements." *Taylor v. Fannie Mae*, 839 F. Supp. 2d 259, 260 (D.D.C. 2012). The FAA reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S 1, 24 (1983); and then quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)) (internal quotation marks omitted). The FAA provides that "district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4). In doing so, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone*, 460 U.S. at 24–25. Accordingly, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147–48 (2024) (quoting 9 U.S.C. § 2).

When considering a motion to compel arbitration, courts in this Circuit apply the summary judgment standard of Federal Rule of Civil Procedure 56(c). *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008); Fed. R. Civ. P. 56(c). Summary judgment is warranted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "The party seeking to compel arbitration must present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 129 (D.D.C. 2013) (quoting *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012)) (internal quotation marks omitted). "The burden then shifts to plaintiffs to show that there is a genuine issue of material fact as to the making of the agreement." *Id.*

"In resolving a motion to compel arbitration, the focus is on the arbitrability of the dispute rather than the dispute itself . . . and accordingly, a court may not weigh the merits of a grievance when determining whether to compel arbitration." *Sakyi v. Estée Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018) (internal citations and quotations omitted). Irrespective of the presumption in favor of arbitrability, "[a]rbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase*, 602 U.S. at 145. When determining whether parties have agreed to arbitrate a dispute, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

District courts considering a motion to compel arbitration engage in a "two-part inquiry," first looking at "whether the parties entered into a valid and enforceable arbitration agreement." *Fannie Mae*, 839 F. Supp. 2d at 261 (citing *Nur v. K.F.C. USA, Inc.*, 142 F. Supp. 2d. 48, 50–51

7

(D.D.C. 2001)). If, as here, the non-moving party argues there is not a valid agreement to arbitrate, the court must determine if there has been "a meeting of the minds on the agreement to arbitrate." *Aliron Int'l.*, 531 F.3d at 865. If the court determines there is a valid arbitration agreement between the parties, the second step is for the court to determine whether the arbitration agreement "encompasses the claims raised in the complaint." *Fannie Mae*, 839 F. Supp. 2d at 261 (citing *Nur*, 142 F. Supp. 2d at 50–51). While the "default rule" is that "the question of arbitrability is usually for the Court to decide," *Haire*, 925 F. Supp. 2d at 132, parties can "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Coinbase*, 602 U.S. at 148 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019)).

## III.   DISCUSSION

### A. There is a Valid Agreement to Arbitrate Between the Parties

The first question for the Court is whether there is a valid and enforceable arbitration agreement between the parties. *Fannie Mae*, 839 F. Supp. 2d at 261. The Court concludes that the text and structure of the arbitration agreement and Mr. Williams' actions show that a valid and enforceable agreement to arbitrate exists.

#### i.   Choice of Law

Absent an effective choice-of-law provision, "District of Columbia courts . . . consider[] which of the relevant jurisdictions has the more substantial interest in having its law applied and the more significant relationship to the litigation." *Africare v. Xerox Complete Document Sols.*, 436 F. Supp. 3d 17, 31 (D.D.C. 2020) (citing *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 569 F. Supp. 2d 67, 72–73 (D.D.C. 2008)). D.C. courts look at five factors in this analysis: "[1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and [5] the domicil[e], . . . place of incorporation and

8

place of business of the parties." *Id.* (quoting *Bode & Grenier*, 808 F.3d at 864 (D.C. Cir. 2015)) (alterations in *Africare*).

Mr. Williams is a resident of the District of Columbia, *see* Compl. ¶ 4, and resided in D.C. when he enrolled in CreditWorks. Mr. Williams received the contracted-for services in D.C. as well. Although Mr. Smith avers that he works for CIC in Costa Mesa, California, *see* Smith Decl. ¶ 1, and that a party seeking to compel arbitration must send notice to Costa Mesa, California, *id.* Ex. 4, none of the defendants' filings specify a domicile for CIC, EIS, or ECS. Given the lack of a contrary choice of law provision, the Defendants' nationwide presence, and Mr. Williams's relationship to the District of Columbia, the Court finds that District of Columbia law should govern this dispute.

  ii.  *Validity of the Agreement*

Mr. Williams argues that there is no valid agreement to arbitrate between himself and the defendants due to "lack of mutual assent and consideration." Opp'n. at 4–5. At the outset, the Court will dispose of Mr. Williams' lack of consideration argument. He states that the CreditWorks' services were "misleadingly marketed as 'free'" even though he "was required to surrender personal rights and information as the actual cost of the service, which constitutes a lack of consideration." Opp'n at 2. Without addressing Mr. Williams' claim of misleading advertising, in any event, Mr. Williams has actually identified consideration: providing information for the receipt of credit monitoring services. "An exchange of promises or a detriment to the promisee constitutes legally sufficient consideration, so long as it is bargained-for." *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 27 (D.D.C. 2017) (quoting *Wash. Inv. Partners of Delaware, LLC v. The Securities House, K.S.C.C.*, 28 A.3d 566, 574 (D.C. 2011)).

Mr. Williams' argument that the agreement lacks mutual assent similarly fails. Case law in this Circuit establishes that parties are bound by arbitration agreements contained in a hyperlinked terms of service agreement where users had reasonable notice of the terms of service and the arbitration agreement contained therein. In *Selden v. Airbnb*, the plaintiff was presented with the following statement, directly below three sign-up options, when he signed up for Airbnb: "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms." 4 F.4th 148, 152–53 (D.C. Cir. 2021). The "terms and policies appeared in red text . . . and were hyperlinked to the full policies," which contained a binding arbitration agreement. *Id.* at 156. The court held that a valid agreement to arbitrate existed between the plaintiff and Airbnb "because [the plaintiff] had reasonable notice of the Terms of Service and the arbitration clause therein." *Id.* at 155. The "type of screen" the plaintiff saw when he signed up for Airbnb "is known as 'sign-in wrap,' a website 'designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process.'" *Id.* at 156 (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015)). The court explained that determining "whether a sign-in wrap provides reasonable notice of the terms to which the user is agreeing[,]" requires looking to "the layout and language of the site" to determine whether a user has "reasonable notice that a click—i.e., signing up—will manifest assent to an agreement." *Id.* at 156 (quoting *Meyer v. Uber Techs.*, 868 F.3d at 66, 75, 77) (internal quotation marks omitted). In reaching their decision the court reasoned that the consumer had adequate notice because of the screen's "simple design[,]" and the contrasting red text indicating a hyperlink to a separate page with the Terms of Use. *Id.* at 156–57.

Here, like in *Selden*, the phrase "Terms of Use Agreement" appeared in bold font in a different color, blue in this case, indicating a hyperlink which led to the complete TOU. Smith

Decl. Ex. 2. As in *Selden*, the notice to users that they assented to the "Terms of Use Agreement" by signing up was in normal-sized font, easy to read, used spacing that ensured it was not cluttered, and drew their attention because it was bolded. *Id.* Finally, the notice appeared on the same webpage as the "Submit Secure Order" button and appeared above it, ensuring that if a user read the text in the proper order, they would read the notice before reaching the "Submit Secure Order" button. *See id.*[3] Therefore, Mr. Williams, like the plaintiff in *Selden*, had reasonable notice that he was assenting to the terms of service and the arbitration agreement therein.

Mr. Williams argues that he did not have "actual or constructive knowledge" of the arbitration agreement. Opp'n at 4. However, as the discussion of *Selden* illustrates, "actual" knowledge is not relevant—the standard is one of constructive notice which, turns on "whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them." *Selden*, 4 F.4th at 156. To argue lack of constructive notice, Mr. Williams cites to *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014). But *Nguyen*—which is merely persuasive, rather than binding, authority—is factually distinguishable. In *Nguyen*, "[t]he website's Terms of Use [were] available via a 'Terms of Use' hyperlink located in the bottom left-hand corner of every page on the Barnes & Noble website," and "appear[ed] underlined and set in green typeface in the lower lefthand corner of every page in the online checkout process." *Nguyen*, 763 F.3d at 1174. The court held that this setup—a "conspicuous hyperlink" with "close proximity . . . to relevant buttons users must click on" —is insufficient for constructive notice without any affirmative action required by the user to demonstrate assent. *Id.* at 1178–79. Unlike *Nguyen*, the CreditWorks sign-up process requires the affirmative action by

---

[3] *Selden* applied California law, but "[t]he D.C. and California law requirements for formation of a binding contract . . . do not differ in material respects." *Gambo v. Lyft, Inc.*, 642 F. Supp. 3d 46, 54 (D.D.C. 2022) (applying the reasoning of *Selden* to a contract under D.C. law to hold that a valid agreement to arbitrate existed).

11

the user. It provides notice to users that by signing up, they are agreeing to the "Terms of Use Agreement." Smith Decl. Ex. 2. The notice appeared above the "Submit Secure Order" button, was in bold font and was easy to read, and, unlike in *Nguyen*, explicitly informed users that "[b]y clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement." *Id.*

Mr. Williams also cites *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) to argue that hyperlinking terms is insufficient to provide adequate notice. Opp'n. at 5. This argument misreads the case law—*Specht* does not hold that hyperlinking is per se insufficient notice. In any event, *Specht* is not binding and is distinguishable on its facts. In *Specht*, the terms of use at issue were "located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen." *Specht*, 306 F.3d at 23. The Second Circuit took issue not with the hyperlinking, but rather, the fact that there was not "an immediately visible notice of the existence of license terms," nor did they "require unambiguous manifestation of assent to those terms." *Id.* at 31. A "reasonably prudent offeree" in the plaintiffs' position would "not necessarily have known or learned of the existence" of the agreement. *Id.* at 30.

But here, unlike in *Specht*, the terms of use are immediately visible: the entire disclaimer does not require a user to scroll to view the disclaimer or the hyperlink to the TOU. Smith Decl. Ex. 2. The disclaimer is in bold text to draw the user's attention to it, the phrase "Terms of Use Agreement" is in blue text indicating a hyperlink, and the disclaimer is not buried in fine print. *Id.* All these distinguishing features confirm that Mr. Williams received adequate notice that by clicking the "Submit Secure Order" button, he was agreeing to the TOU.

In addition to arguing that the CreditWorks sign-up page provided inadequate notice, Mr. Williams also argues there was no mutual assent because the text of the TOU itself lacked clear language and did not provide meaningful notice of the arbitration agreement. Opp'n at 5.

12

This argument is rebutted by looking at the TOU's plain language. The arbitration agreement in the 2018 TOU, which Mr. Williams was presented with when he signed up, begins with capitalized text in large purple font reading "DISPUTE RESOLUTION BY BINDING ARBITRATION." Smith Decl. Ex. 3. Directly underneath that, in normal-sized capitalized text it reads "PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS." *Id.* The same is true of the 2023 TOU: the beginning of the arbitration agreement is indicated by the same title in capitalized, extra-large bold font and the same disclaimer about the effect on the user's rights appears in capitalized normal-sized font. Smith Decl. Ex. 4. This capitalized text in the body of the TOU itself provided Mr. Williams with meaningful notice.

Mr. Williams also asserts that he had no notice of the arbitration provision until he was preparing for this case, even though the facts belie this claim. Opp'n at 5. The defendants have produced a true and accurate representation of the TOU in effect when Mr. Williams registered for CreditWorks (the 2018 TOU) and the TOU governing this dispute (the 2023 TOU) as well as evidence that Mr. Williams assented to both. *See* Smith Decl. ¶¶ 2, 5; *see also id.*, Ex. 3, 4. Mr. Williams has not challenged the validity of these documents and does not dispute that he signed up for CreditWorks. *See* Compl. ¶ 60. In other words, Mr. Williams had "notice" of the agreement; he just did not read it. His apparent failure to read the agreement does not mean he is not bound by it. "[A]bsent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 908 (D.C. Cir. 2024) (quoting *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017)). Mr. Williams cites to *Kulig v. Midland Funding, LLC*, in which the court held that the plaintiff had not assented to a terms-of-service agreement containing the arbitration agreement, because the defendant produced an agreement dated after the last day on which the plaintiff used her account.

2013 WL 6017444 (S.D.N.Y. Nov. 13, 2023) at *3.  But that is inapposite here, because this agreement existed well in advance of Mr. Williams' last use of his account.  Mr. Williams assented to the contract by clicking "Submit Secure Order" having been provided meaningful notice that by doing so, he was agreeing to the TOU.[4]  For all these reasons, the Court holds that a valid agreement to arbitrate exists between Mr. Williams and the defendants.

### B. Defendant EIS Can Enforce the Arbitration Agreement

Mr. Williams argues that EIS cannot enforce the arbitration agreement because it is not a party to the agreement, and that only ECS can.  *See* Opp'n. at 6–7.  The Court concludes that EIS and CIC are parties to the arbitration agreement based on the definitions of ECS, EIS, and CIC in the arbitration agreement, the agreement's "arising under" clause, and EIS's contributions to CreditWorks; accordingly, EIS can enforce the arbitration agreement.

The arbitration agreement states "ECS and you agree to arbitrate all disputes and claims between us that arise out of or relate to this Agreement," and further provides "[t]he agreement to arbitrate includes, but is not limited to, claims brought by you against ECS, whether based in contract, tort, statute (including, without limitation, the Fair Credit Reporting Act . . .), for fraud, misrepresentation or any other legal theory . . . ."  2023 TOU, Ex. 4 to Smith Decl.  To decide whether EIS may directly enforce the arbitration agreement, two definitions are relevant.  First is the definition of "ECS," which the 2023 TOU defines as "[CIC] . . . its predecessors in interest,

---

[4] The defendants also submitted a Notice of Supplemental Authority requesting consideration of *Clark v. Trans Union LLC*, No. 24-cv-783 (WBS), 2024 WL 4044130 (E.D. Cal. Sept. 4, 2024) and *Jenkins v. Experian Info. Sols.*, No. 23-cv-1634 (PTG), 2024 WL 4100258 (E.D. Va. Sept. 6, 2024).  Notice of Suppl. Authority, ECF No. 20.  In both *Clark* and *Jenkins*, the issue was the validity of an arbitration agreement like the one here.  *See Clark*, 2024 WL 4044130 at *2, 4; *Jenkins*, 2024 WL 4100258 at *2.  Mr. Williams asserts that those cases do not help defendants because in those cases, the plaintiffs were aware of the arbitration clauses because they "took affirmative steps to agree to arbitration (i.e., by clicking a button that included an arbitration notice)."  Resp. to Def.'s Notice of Suppl. Auth. at 1–2.  Far from rebutting the defendants' argument, Mr. Williams' argument actually works against him.  He states that in *Jenkins*, "the court found that the plaintiff had clicked to accept the Terms of Use which clearly disclosed the arbitration clause."  *Id.* at 1–2.  This is exactly what Mr. Williams did here.  *See Clark*, 2024 WL 4044130 at *2–3; *Jenkins*, 2024 WL 4100258 at *2.

successors and assigns, [and] affiliates" and expressly lists EIS as an affiliate. *Id.* Second is the definition of "you," which the 2023 TOU defines to mean "a Visitor or a Customer." *Id.* These definitions are expressly incorporated into the arbitration agreement. *Id.*

By defining ECS to cover both EIS and CIC, the two named defendants in this case, the arbitration agreement includes EIS and CIC as parties that agreed to arbitrate disputes arising from the agreement. Courts around the country have reached a similar conclusion. In *Meeks v. Experian Info. Sols., Inc.*, the Ninth Circuit considered a Terms of Use Agreement similar to the 2023 TOU. 2022 WL 17958634 (9th Cir. Dec. 27, 2022) at *1. The court stated that "[t]he text of the arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliates,'" and [EIS] is an affiliate and was so when the plaintiffs entered into the agreement." *Id.* at *2. The court also noted "[t]hat [EIS] was an affiliate at the time the contract was formed and that it plays a role in the larger agreement," which further suggests that EIS assented to be bound and "was not a mere third-party beneficiary." *Id.* This Court adopts the reasoning of *Meeks* and notes that the Smith Declaration's averment that "[a]t all times relevant to this action, EIS contributed to the services that CreditWorks subscribers receive" aligns with the Ninth Circuit's reasoning above and further supports the Court's conclusion. Smith Decl. ¶ 8; *see also Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 26-27 (E.D.N.Y. 2023) (finding that [EIS] was an affiliate of ECS and that the Plaintiff had assented to arbitration with [EIS]); *Levy v. CreditPlus, Inc.*, No. 21-cv-5541 (KMK), 2023 WL 2644352 at *6 (S.D.N.Y. Mar. 27, 2023) (finding that "Defendant is an affiliate of ECS and thus a party to the contract" based on the definition of ECS including its affiliates, a sworn affidavit stating CreditPlus is an affiliate of ECS, and the language of the TOU); *Morgan v. Experian Info. Sols., Inc.*, No. 21-cv-5783 (JCC), 2022 WL 681359 at *1 (E.D. Wash. Mar. 4, 2022) ("It is undisputed that the TOU applies to ECS affiliates . . . .").

### C. Arbitrability Disputes are Delegated to the Arbitrator

Having determined that a valid agreement to arbitrate exists and that EIS is a party to that agreement, the Court next determines whether it is for the Court, or the arbitrator, to decide whether "the dispute at issue comes within the scope of the arbitration agreement." *See Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 95 (D.D.C. 2005) (describing the two-step process in compelling arbitration: first determining the agreement's validity, and then determining that agreement's scope). This question of "arbitrability" of Mr. Williams' specific legal claims, Defendants argue, has been delegated to the arbitrator. Mot. to Compel at 14. Mr. Williams, however, argues that this delegation clause fails to pass muster. Opp'n at 7. Here again, the defendants prevail.

In determining who decides threshold questions of arbitrability, the presumption in favor of arbitration does not apply: instead, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chi.*, 514 U.S. at 944 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (alterations omitted). Defendants argue that this "clear and unmistakable" standard is met because the delegation clause says "[a]ll issues are for the arbitrator to decide including, but not limited to . . . all issues regarding arbitrability[.]" Motion to Compel at 4; Reply at 14 (citing ECF No. 17-1, Ex. 4). The Court agrees—this clause clearly and unmistakably evinces the parties' intent to delegate arbitrability by its plain language. Adding further support for this conclusion, the arbitration agreement also provides that the parties will "arbitrate all disputes and claims between us that *arise out of or relate to* this Agreement[.]" Smith Decl. Ex. 4 (emphasis added). Courts in this district have held that arbitration clauses that use "arising out of" clauses, as this one here, demonstrate the parties' intent to have an arbitrator decide questions of arbitrability. *See Sakyi*, 308 F. Supp. 3d at 378 (noting that "'broad, all-encompassing language'

16

in an arbitration agreement is 'clear evidence that the parties agreed to arbitrate all issues' arising between them, including the question of arbitrability") (quoting *W&T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 167 (D.D.C. 2014)). Finally, as an independent reason for validity of the delegation clause, the agreement states that arbitration will be "governed" by the "Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes . . . of the American Arbitration Association [AAA]."[5] Smith Decl. Ex. 4. The AAA rules give the arbitrator the power to rule on arbitrability of any claim or counterclaim, and "adopting the AAA rules makes the issue of arbitrability one for the arbitrator, not the court, to decide." *Sakyi*, 308 F. Supp. 3d. at 378.

### D. Mr. Williams' Unconscionability Claims Are Delegated to the Arbitrator[6]

Because the Court finds that this delegation clause is valid, the Court declines to reach Mr. Williams' argument that the agreement is procedurally[7] and substantively unconscionable. The delegation clause broadly delegates "[a]ll issues are for the arbitrator to decide including . . . (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, [and] . . . (iv) whether all or any part of this

---

[5] The Court notes here that it is unable to locate set of rules with the title "Commercial Dispute Resolution Procedures." The website of the American Arbitration Association (adr.org) contains a set of rules entitled "Commercial Arbitration Rules and Mediation Procedures" that appears to the be the closest to what is referred to in the arbitration agreement. There is also a set of rules entitled "Consumer Arbitration Rules." Regardless of which set of rules is referenced, the text of the rule is the same.

[6] To the extent Mr. Williams asserts that the delegation clause *itself* is unenforceable, the Court will consider such a challenge. *See Mercadante v. XE Services*, LLC, 78 F. Supp. 3d 131, 143 (D.D.C. 2015) (considering a challenge "only insofar as Plaintiffs argue that the delegation agreement was unconscionable; insofar as Plaintiffs claim that the agreement as a whole was unconscionable or even that the arbitration provision was unconscionable, the Court cannot consider those arguments"). But Mr. Williams does not flesh out his unconscionability argument: he merely states that "the [delegation] clause was presented in a procedurally unconscionable manner, further undermining its enforceability." Opp'n at 7. This conclusory statement is clearly insufficient to demonstrate unconscionability under D.C. law, and without more, the Court does not find that the delegation clause is unconscionable.

[7] The Court observes that Mr. Williams' short procedural unconscionability challenge mirrors his challenges to the overall validity of the agreement. *See* Opp'n at 5–6. But to the extent the procedural unconscionability challenge could raise distinct arguments not already addressed by this Court, those challenges must be resolved in arbitration.

17

arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability[.]" Reply at 9 (citing ECF No. 17-1, Ex. 4). Thus, Mr. Williams' thin unconscionability challenge to the agreement must be resolved in arbitration. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 73–74 (holding that a delegation clause, which delegates the issue of unconscionability of the agreement to the arbitrator, is enforceable).

### IV.   CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' Motion [17] to compel arbitration and stay proceedings and will **ORDER** the parties to arbitrate all claims asserted in Mr. Williams' complaint. This matter will be **STAYED** pending arbitration. A separate Order shall issue.

Date: 12-20-24

Royce C. Lamberth
United States District Judge